IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **ROBERT MORRIS,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**ERIC EVANS, CALEB ZANG, BRADLEY SADLER, MAYNARD AGNE, ANDREW STORY, LEVI GAETZ, MICHAEL LAMINACK, JASON MORRIS, and PHILLIP ROYSTER,**<br><br>**Defendants.** | **Case No. 3:23-CV-3302-NJR** |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

Plaintiff Robert Morris, an inmate of the Illinois Department of Corrections who is currently incarcerated at Menard Correctional Center ("Menard"), brings this action *pro se* under 42 U.S.C. § 1983 against Defendants Eric Evans, Caleb Zang, Bradley Sadler, Maynard Agne, Andrew Story, Levi Gaetz, Michael Laminack, Jason Morris, and Phillip Royster (collectively, "Defendants"). Morris claims correctional officers at Menard violated his Eighth Amendment rights by deploying pepper spray against him, beating him, and placing him in a cell contaminated with chemical agents.

Before the Court is Defendants' Motion for Summary Judgment as to Count 1 only. (Doc. 59). Morris opposes the motion (Doc. 67), and Defendants filed a reply brief. (Doc. 68). For the reasons set forth below, Defendants' motion is granted in part and denied in part.

## BACKGROUND

Morris's claims in this case were severed from his original claims in *Morris v. Jeffreys, et al.*, Case No. 23-CV-1162-DWD. (Doc. 1). After review of the severed claims pursuant to 28 U.S.C § 1915A, two of Morris's counts were permitted to proceed:

> **Count 1:** Eighth Amendment excessive force or cruel and unusual punishment claim against Defendants Royster, Evans, Zang, Sadler, Agne, Story, Gaetz, Laminack, and Morris for releasing pepper spray on April 4, 2022.
>
> **Count 3:** Eighth Amendment excessive force claim or cruel and unusual punishment claim against Defendants Sadler, Agne, Story, Gaetz, Laminack, and Morris for allegedly beating Morris on April 4, 2022, after removing him from the healthcare unit, and for then placing him in a cell contaminated with chemical agents.

(Doc. 17, p. 3). Defendants seek summary on Count 1. They argue that Defendants Zang, Agne, Story, Gaetz, Laminack, and Morris did not pepper spray Plaintiff and lacked personal involvement in the constitutional violation. Therefore, they should be dismissed from Count 1. They also argue that Defendants Royster and Sadler lacked the requisite intent to state an excessive force claim and are entitled to qualified immunity.

### I. Compliance with Rule 56 and Local Rule 56.1

Before establishing the material facts, the Court addresses the procedural issues raised in Defendants' reply brief.

#### A. Federal Rule of Civil Procedure 56

Under the Federal Rules of Civil Procedure, the party opposing a motion for summary judgment must properly address the moving party's assertions of fact. FED. R. CIV. P. 56(e). To properly dispute an assertion of fact, the non-moving party must (1) cite

to specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support of his position, or (2) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute. FED. R. CIV. P. 56(c)(1). An affidavit or declaration must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant of declarant is competent to testify on the matters stated. FED. R. CIV. P. 56(c)(4). When a party fails to properly support an assertion or fails to properly address another party's assertion of fact, the district court may consider the fact undisputed for purposes of the motion. FED. R. CIV. P. 56(e).

Defendants argue that Morris did not comply with Southern District of Illinois Local Rule 56.1(b) when he failed to add citations to the record in his disputes to Defendants' statement of material facts. Defendants further argue that, according to Local Rule 56.1(f), their statement of material facts should be deemed admitted and Plaintiff's disputes disregarded.

B. Local Rule 56.1

Local Rule 56.1(b) requires that briefs in opposition to a motion for summary judgment contain a response to the movant's statement of material facts and specific citations to the record. SDIL-LR 56.1(b). Local Rule 56.1(f) then provides: "The Court will disregard any asserted fact that is not supported with a citation to the record, unless the factual basis for the assertion is clearly identifiable from the parties' related citations or permissible inference." SDIL-LR 56.1(f).

Here, Morris responded to each statement of fact, but he failed to add citations when doing so. (*See* Doc. 67, pp. 1-3). Defendants argue that because Morris failed to abide by Local Rule 56.1(b), the Court should invoke Local Rule 56.1(f) to admit Defendants' material facts.

The Court declines to do so. The Court agrees that Morris's opposition to Defendants' motion violated Local Rule 56.1(b) because he did not generally include citations to the record when disputing Defendants' statement of material facts. (*See* Doc. 67 at pp. 1-3). Nevertheless, in light of Morris's *pro se* status, the Court will consider Defendants' facts disputed if there is evidence in the record to support Morris's position. *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."); *see also Oris v. Demarasse*, 886 F.3d 639, 644 (7th Cir. 2018) (quoting *Lovelace v. Dall*, 820 F.2d 223, 228 (7th Cir. 1987) ("[The Seventh Circuit] [has] long recognized that *pro se* litigants must be afforded 'leniency . . . on procedural matters.'")).

**II. Undisputed Material Facts**

The following facts are not in dispute unless otherwise noted.

On March 28, 2022, Morris began a hunger strike and was put on crisis watch for potential suicidal behavior. (Doc. 59-2 at p. 7; Doc. 59-3 at pp. 9-13). Morris considers himself seriously mentally ill. (Doc. 2, p. 15). As a nurse noted, Morris was "at risk of self-harm" just a day prior to the events at issue. (Doc. 59-3 at p. 1). Morris also has a history of disciplinary infractions. (Doc. 59-4 at pp. 1-4). His record includes sexual misconduct, fighting with other individuals in custody, disobeying direct orders, threatening staff,

arson, throwing substances—including bodily waste—on staff, and one instance of possessing a homemade weapon. (Doc. 59-4).

A. Pepper Spray Incident by Defendant Royster

One week after Morris began his hunger strike, on April 4, 2022, Defendants Evans and Royster arrived at Morris's cell to take him to a routine medical and mental health examination. (Doc. 59-2 at pp. 7-8; Doc. 59-5 at pp. 10-11). Both officers were aware of Morris's hunger strike and his status on crisis watch. (Doc. 59-4 at pp. 10-11).

The events following Defendants' arrival are disputed. In his deposition, Morris stated that his chest and legs were hurting that day. (Doc. 59-2 at p. 7). Morris claims he informed officers that he wasn't feeling well and that his legs were feeling weak. (*Id.*). Morris testified that an officer told him to just lay back down on his bed. (*Id.*). Once he did so, Royster pepper sprayed Morris "ridiculously," for "some minutes," and he fell out of his bed. (*Id.* at p. 8).[1] After falling on the floor, Morris claims he was "kind of unconscious." (*Id.*).

Morris's account in his deposition differs somewhat from the April 24, 2022 grievance he filed regarding the incident. (Doc. 49 at p. 4; *see also* Doc. 25-1 at pp. 121-22). In his grievance, Morris described the events as follows:

> Morris informed the officers that he could not feel his legs and he had pains in his heart for several days. The sergeant on duty directed him to leave the cell and threatened to pepper spray Morris. Morris informed the sergeant that his actions would amount to cruel and unusual punishment. The sergeant then maced Morris for 11 seconds, causing Morris to hyperventilate and experience pain in his chest.

[1] Morris's deposition is sometimes unclear regarding which officer engaged in each action. Both Morris and Defendants agree, however, that Defendant Royster released the pepper spray. (Doc. 59-5 at p. 3; Doc. 67 at p. 2; Doc 59-2 at pp. 7-8).

(Doc. 49 at p. 4) (internal citations omitted).

According to Defendants' version of events, Morris refused multiple direct orders. (*See* Doc. 59-5 at p. 11; Doc. 59-5 at p. 10). Royster's Incident Report states that while getting dressed, Morris "became angry" and said, "I just want to kill myself." (Doc. 59-5 at p. 11). Royster attempted to talk Morris out of his cell to speak to a mental health professional, but Morris began removing a shoelace from one of his shoes saying, "No, I'm just going to kill myself." (*Id.*). When Morris began tying a knot in the shoelace, Royster gave him multiple direct orders to put it down. (*Id.*). When Morris ignored Royster's orders, he "administered a burst of OC pepper spray in an attempt to stop Morris's self-harming actions." (*Id.*).[2] Defendant Evans's Incident Report includes a similar description of events. (Doc. 59-5 at p. 10).

B. Pepper Spray Incident by Defendant Sadler

The material facts leading to the second pepper spray event are less contested. Royster's Incident Report states that, after pepper spraying Morris, the officers gave Morris another direct order to come to the door to be restrained. (Doc. 59-5 at p. 11). Morris refused and "then laid on the floor stating, 'I can't get up.'" (*Id.*). At this time, Royster notified Defendant Zang to attempt to de-escalate the situation. (Doc. 59-5 at p. 9). Zang gave Morris multiple additional direct orders to come to the front of the cell, which Morris refused. (*Id.*). Morris remained laying on the floor. (*Id.*). Another officer, who is not a party to this suit, also attempted de-escalation techniques to get Morris to

[2] In his deposition, Morris stated that Royster began to hand Morris his shoes until Royster noticed that the shoes still had shoelaces in them, which Morris was not allowed to have. (Doc. 59-2 at pp. 8-9). Morris claims that the officers took his shoelaces out and then handed him his shoes. (*Id.*).

come out of his cell. (Doc. 59-5 at p. 8). Eventually, a tactical team led by Sadler and comprised of Defendants Agne, Story, Gaetz, Laminack, and Morris was called for a cell extraction. (Doc. 59-5 at pp. 2-11).

In his Incident Report, Sadler states that around 30 minutes after the first pepper spray event:

> The extraction team arrived at the cell and observed [Morris] laying on the floor on his stomach with his feet toward the door. I gave him a direct order to come to the door to be cuffed up and he refused. He stated that he could not stand up and stayed on the floor. I then gave him a 2nd direct order to come to the door and he refused stating he could not get up and stayed on the floor. I th[e]n gave him the third direct order to come to the door and he refused stating he could not get up. Morris [] also had his hands tucked under him. I then utilized a burst of OC pepper spray on him.

(Doc 59-5 at p. 7).

In his deposition, Morris testified that after the first pepper spray, he fell onto the floor, likely face-down, and "was kind of unconscious." (Doc. 59-2 at pp. 8, 10, 12). As a result, Morris claims he doesn't remember anything else until waking up while being moved to the infirmary. (*Id*.). Unsworn affidavits by inmates in nearby cells fill in the holes in Morris's version of events. (Doc. 67 at pp. 10-12).[3] Allen Brown Jr.'s affidavit states that a tact team arrived and officers ordered Morris to get up off the ground. (*Id*. at p. 10). Morris then told the Officers that "[he] [was] not resisting." (*Id*.). This version of

---

[3] Unsworn affidavits are admissible when the individual declares the veracity of their statement under penalty of perjury. 28 U.S.C. § 1746(2). The attached affidavit by Allen Brown Jr. incorporates the requisite declaration. (Doc. 67 at p. 11). The affidavit of Kevonta Thomas also includes a declaration of penalty of perjury; however, the declaration does not include certain key language (e.g. "I declare under penalty of perjury"). (Doc. 67 at p. 12). For this reason, the Court only considers Allen Brown Jr.'s affidavit. (Doc. 67 at p. 11).

events diverges from Morris's claim that he could not respond because he was unconscious.

C. Cell Extraction and Following Events

After Sadler sprayed Morris, the parties agree that Morris did not follow further orders to show his hands, which were placed under his body, or to get up. (Doc. 59-5 at p. 7; Doc. 67 at p. 3). Sadler then ordered the rest of the tact team to extract Morris. (Doc. 59-5 at p. 7). Story, Agne, and Gaetz entered the cell, removed Morris, and placed him in a wheelchair. (*Id.*).[4]

The tact team officers took Morris to the infirmary to be seen by medical and mental health staff. (Doc. 59-5 at p. 7). At the infirmary, Morris used the eyewash station. (Doc. 59-3 at p. 2).[5] Morris repeatedly told the nurse, "my head hurts" and it was determined that he should be referred to the healthcare unit for an EKG. (*Id.* at p. 4).

At the healthcare unit, Morris had an EKG taken and he washed his eyes out for a second time at an eyewash station. (Doc. 59-3 at pp. 6-7; Doc. 59-2 at p. 11). The nurse practitioner at the healthcare unit recorded that Morris stood at the eyewash station but would not try to walk. (Doc. 59-3 at pp. 6-7). Defendants' incident reports also state that Morris "stood under his own power" at the eyewash station. (Doc. 59-5 at p. 7; *see also* Doc. 59-3 at pp. 3-4, 6). Morris disputes whether he stood up without assistance, although the only evidence supporting this version of events is his testimony that he wasn't able

[4] According to Brown's affidavit, officers "dragged [Morris] from his cell and placed him in a wheel[]chair, and [] took him from the gallery." (Doc. 67 at p. 10).

[5] Morris disputes that he was first taken to the infirmary and that he used the eye wash station. (Doc. 67 at p. 3). However, Morris only states that "[he] doesn't recall this going exactly like that." (*Id.*). There is nothing in the record that refutes these facts and they are therefore admitted.

to walk: "I wasn't able to walk that well . . . I remember them helping me. I remember five arms . . . helping me walk to the station to wash my face." (Doc. 59-2 at p. 11).

The nurse practitioner did not document any injuries on Morris's outpatient notes, (Doc. 59-3 at pp. 6-7), and Morris was cleared to return to his cell. (Doc. 59-2 at p. 11).

## LEGAL STANDARD

Summary judgment is appropriate where there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). When determining whether a genuine issue of material fact exists, the Court views the evidence and draws all reasonable inference in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). When the moving party establishes the basis for summary judgment, the burden then shifts to the non-moving party who must go beyond mere allegations and offer specific facts establishing there is a genuine issue of material fact for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A moving party is entitled to judgment as a matter of law when the non-moving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.*

## DISCUSSION

### I. Excessive Force

The Eighth Amendment 's prohibition against cruel and unusual punishment includes the "unnecessary and wanton infliction of pain" on individuals in custody. *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (quoting *Hudson v. McMillian*, 503 U.S. 1, 5 (1992)). An Eighth Amendment excessive force claim has both an objective

component and a subjective component. *Smith v. Kind*, 140 F.4th 359, 364 (7th Cir. 2025) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

The objective component requires that "the officer's actions were 'objectively harmful enough to establish a constitutional violation.'" *Id.* (quoting *Hudson*, 503 U.S. at 8) (internal quotations omitted). Under an excessive force claim, not every "malevolent touch" implicates the Constitution. *Hudson*, 503 U.S. at 9. A *de minimis* use of force cannot rise to the level of a constitutional violation unless it is exercised in a manner "repugnant to the conscience of mankind." *Id*. at 9-10. This standard does not require an injury, rather courts must look the level of pain inflicted. *Id*. at 9.

Under the subjective component, the plaintiff must show that the officer "acted wantonly and with a sufficiently culpable state of mind." *Lunsford v. Bennett*, 17 F.3d 1574, 1579 (7th Cir. 1994) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). Use of force will be deemed unnecessary and wanton if it is inflicted "maliciously and sadistically to cause harm" rather than "in a good faith effort to maintain or restore discipline." *Smith*, 140 F.4th at 366 (quoting *Hudson*, 503 U.S. at 6). In the absence of direct evidence, the intent to maliciously harm can be inferred from several factors including "(1) the need for the force; (2) the relationship between the need and the amount of force used; (3) the extent of any injury; (4) the threat reasonably perceived; and (5) efforts to temper the force's severity." *Hammer v. Bortz*, No. 23-1842, 2024 WL 2559204, at *3 (7th Cir. May 24, 2025) (citing *Hudson*, 503 U.S. at 7).

A. Defendants' Personal Involvement

Defendants Evans, Zang, Agne, Story, Gaetz, Laminack, and Morris move for

summary judgment with respect to Count 1 on the ground that they did not personally pepper spray Morris.

Liability under 42 U.S.C § 1983 is predicated on a defendant's personal involvement in the alleged constitutional violation. *Palmer v. Marion Cnty.*, 327 F.3d 588, 594 (7th Cir. 2003). To be personally responsible, an official "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." *Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009) (quoting *Johnson v. Snyder*, 444 F.3d 579, 583 (7th Cir. 2006)). "A plaintiff must demonstrate a causal connection between (1) the sued officials and (2) the alleged misconduct." *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) (citing *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983)).

As both parties agree, and as the record makes clear, Defendants Royster and Sadler are the only two individuals who deployed pepper spray against Morris on April 4, 2022. (*See* Doc. 59-5 at p. 11; Doc. 59-5 at p. 7; Doc. 67 at pp. 2-3). None of the other named Defendants were personally involved in the incident. (*See* Doc. 59-5 at pp. 10, 9, 5, 6, 4, 3, 2). Thus, Morris has failed to establish the required causal connection between these Defendants and the alleged misconduct, and they are entitled to summary judgment.

B. Defendant Royster

Morris claims that Royster employed excessive force against him when he released pepper spray into Morris's cell. Royster moves for summary judgment on the basis that he lacked the requisite intent for a claim of excessive force to prevail and, therefore, he is not liable under 42 U.S.C. § 1983. Alternatively, Royster argues that he is protected by the

doctrine of qualified immunity.

"Generally, the use of 'mace, tear gas or other chemical agent of the like nature when reasonably necessary . . . to subdue recalcitrant prisoners' does not constitute a sufficiently serious injury under the Eighth Amendment." *Blackburn v. Royster*, No. 22-CV-01713-SPM, 2026 WL 2469864, at *7 (S.D. Ill. Aug. 24, 2026) (quoting *Soto v. Dickey*, 744 F.2d 1260, 1270 (7th Cir. 1984)). But, "it is a violation of the Eighth Amendment for prison officials to use mace or other chemical agents in quantities greater than necessary or for the sole purpose of punishment or the infliction of pain." *Soto*, 744 F.2d at 1270.

Defendants do not argue that the use of pepper spray by Royster was *de minimus* force; thus, the Court presumes for purposes of summary judgment that the objective harm component has been satisfied.

Turning to the subjective component, there is a genuine issue of material fact as to whether Royster acted with the intent to punish or inflict pain on Morris. Morris testified that he was on a week-long hunger strike and had informed Royster that he was feeling weak. Morris also testified that officers told him he could lay down on his bed before Royster unexpectedly deployed pepper spray against him. If a jury accepts this version of events, Morris was complying with orders and could not reasonably have been perceived as a threat to himself or the officers at the time of the incident. The Seventh Circuit has repeatedly confirmed that evidence of force against a compliant prisoner may constitute excessive force. *Lee v. James*, No. 21-11114, 2021 WL 3197514, at *2 (7th Cir. July 29, 2021) (holding that a reasonable jury could infer a malicious motive from an officer's use of pepper spray on a restrained and compliant inmate); *see also Lewis*, 581 F.3d at 477-

78 (failing to give an inmate a reasonable opportunity to respond to orders before tasering him could be excessive); *see also Williams v. Esser*, No. 21-2175, 2022 WL 258638, *2 (7th Cir. Jan. 27, 2022) (tasering an inmate after he promptly complied with the officer's order may be excessive).

Royster argues that Morris had a history of being aggressive and was on a 15-minute crisis watch at the time of the incident, indicating he may have been a danger to himself or others. While officers may consider this information when interacting with an inmate, it is not enough to apply force without a present need. *See Smith*, 140 F.4th at 367 (finding that an inmate's violent record not justify an escalation of force without cause). Given Morris's testimony that he was following orders and laying on his bed, a reasonable jury could find that Royster acted with the requisite intent for Morris to prevail on a claim of excessive force. For these reasons, Royster is not entitled to summary judgment on Count 1.

C. Defendant Sadler

Morris also asserts that Sadler employed excessive force against him when he released pepper spray into Morris's cell. (Doc. 2 at p. 20-21). Like Royster, Sadler moves for summary judgment on the basis that he lacked the requisite intent for Morris to prevail on a claim of excessive force. Unlike Royster, however, no reasonable jury could find that Sadler had the subjective intent to maliciously harm Morris.

Construing the facts in the light most favorable to Morris, Sadler and the extraction team arrived almost 30 minutes after Royster's application of pepper spray. Sadler found Morris lying face-down on the ground of his cell with his hands underneath his body.

After giving Morris three orders to come to the front of the cell with no compliance, Sadler applied a burst of pepper spray. Sadler gave Morris a final order to come to the front of the cell before sending in cell extraction team to forcibly restrain Morris.

Correctional officers are permitted to use pepper spray when necessary to maintain institutional security. *See Soto*, 744 F.2d at 1271 (upholding the application of pepper spray when it "was used for failure of the inmate to obey a direct order and use of mace was a reasonable response to the institution's legitimate security concern."). In this case, the facts suggest that Sadler reasonably deployed pepper spray to persuade Morris to comply before sending in officers to physically force Morris into restraints. There is no evidence that Sadler used the pepper spray to "maliciously and sadistically" cause harm rather than to restore discipline.

Even if Morris was unable to comply with orders, a reasonable officer still could have perceived him as a threat. Viewing the evidence in the light most favorable to Morris, Morris was either unconscious or in a state of semi-consciousness and was physically unable to abide by any of the officers' orders. Multiple cases suggest that an officer's awareness of whether an inmate is able to comply with an order can determine the constitutionality of force. *See, e.g.*, *Whitaker*, 144 F.4th at 924 ("[The plaintiff] has not provided any evidence that [the defendant] could or should have appreciated that he was 'unable, as opposed to unwilling, to comply.'") (quoting *Rice ex rel. Rice v. Corr. Med. Serv.*, 675 F.3d 650, 688 (7th Cir. 2012)). Here, even if Morris was partially or completely unconscious, he has provided no evidence that Sadler knew Morris was unable, as opposed to unwilling, to comply with his order.

Morris's background is also relevant. Morris's record includes multiple incidents of threatening staff, throwing substances on them, and one instance of possessing a contraband weapon. Given that Morris's hands were under his body, a reasonable officer could determine that there was a risk of Morris possessing a weapon.

Additionally, the use of force, in this instance, was minimal. There is no record evidence to suggest that the application of pepper spray was extreme. Sadler's Incident Report states that he administered only one burst of pepper spray, which Morris does not dispute. (Doc. 59-5 at p. 7). "Many inmates may experience pepper spray as a relatively minor use of force." *Smith*, 140 F.4th at 369. And the application of pepper spray was likely a safer alternative than a physical altercation. *See Soto*, 744 F.2d at 1262 ("Without exception, the institutional officials and officers were of the opinion that the use of mace was much more humane and effective than a flesh to flesh confrontation with an inmate."); *see also Whitaker*, 144 F.4th at 924 (noting that "pepper spray was less intrusive than, and likely preferable to, a physical struggle"). After nearly 30 minutes of various officers' attempts to persuade Morris to voluntarily be restrained, Sadler deployed a single burst of pepper spray presumably as a last-ditch effort to avoid a physical confrontation and to allow the tactical team to safely enter the cell. Because this use of force was relatively minor, it was proportional to the potential threat posed by Morris. Defendants' motion for summary judgment as to Defendant Sadler's is therefore granted.

D. Qualified Immunity

Defendant Royster also argues that the doctrine of qualified immunity bars any liability for his actions under 42 U.S.C. § 1983.

The doctrine of qualified immunity is an affirmative defense that "shields officers" from civil liability so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullinex v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). In reviewing whether a government official is protected by the doctrine of qualified immunity, a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right and whether the right at issue was "clearly established" at the time of the alleged misconduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Pearson*, 555 U.S. at 236. "The contours of the right must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

Crediting Morris's version of events, Royster is not entitled qualified immunity. The Court has determined that a jury could find Royster's use of pepper spray violated Morris's constitutional rights. It was also clearly established at the time of the incident that "[n]o reasonable guard would think using such force on a docile . . . inmate was justified." *Lewis v. Downey*, 581 F.3d 467, 479 (7th Cir. 2009). While the Seventh Circuit has approved of the use of chemical agents, including mace and tear gas, to compel compliance with orders, it has also cautioned that "such force could not be 'exaggerated or excessive' and should generally follow 'adequate warning[s].' " *Id.* (quoting *Soto*, 744 F.2d at 1270-71).

Defendants point to *Smith*, where the Seventh Circuit upheld the grant of qualified immunity to an officer in circumstances somewhat similar to those here. *Smith*, 140 F.4th

at 363. In *Smith*, the inmate was on a 50-day hunger strike and had refused, for the fifth time, to walk to the healthcare unit. *Id.* The defendant officer observed that although the Smith had been peaceably removed from his cell the previous three days, there was no way of knowing if he had a weapon in his cell. *Id.* For five minutes, the officer directed Smith to come to the cell door. *Id.* When Smith refused to do so, the officer informed Smith of his intent to use pepper spray to gain compliance. *Id.* When Smith still did not come to the door, the officer deployed a burst of pepper spray. *Id.* Under these specific circumstances, the Seventh Circuit held that a reasonable correctional officer would not have known that "using pepper spray to extract Smith from his cell violated the Eighth Amendment." *Id.* at 370.

Here, Morris testified that when officers approached his cell, he told him his legs and chest hurt, and his legs were weak. An officer then told him to lay down on the bed. Unlike the inmate in *Smith*, Morris complied with the officer's instructions. And unlike the officer in *Smith*, who alerted Smith he was going to deploy pepper spray, Morris testified that Officer Royster pepper-sprayed him without warning for an extended period of time, causing him to fall out of his bed. Accepting Morris's version of the facts as true, the Court finds that Officer Royster is not entitled to qualified immunity.

## Conclusion

For these reasons, the Motion for Summary Judgment as to Count 1 filed by Defendants (Doc. 59) is **GRANTED in part and DENIED in part**.

Judgment as a matter of law is **GRANTED** to Defendants Zang, Agne, Story, Gaetz, Laminack, Morris, and Sadler as to Count 1 and **DENIED** as to Defendant Royster.

Plaintiff Robert Morris shall proceed on his claim of excessive force against Defendant Royster in Count 1 and his claim against all Defendants in Count 3.

The Court will set a status conference by separate order to discuss next steps.

**IT IS SO ORDERED.**

**DATED: September 28, 2026**

**NANCY J. ROSENSTENGEL**
**United States District Judge**